ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANNE C. HSIEH (CABN 288159)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5081
    annie.hsieh@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 23-CR-364-BLF |
|     Plaintiff, ) | |
| ) | **NOTICE OF MOTION AND MEMORANDUM** |
|     v. ) | **IN SUPPORT OF UNITED STATES' MOTION** |
| ) | **FOR PRETRIAL DETENTION** |
| PETER KARASEV ) | |
|     Defendant. ) | Date: November 7, 2022 |
| ) | Time: 1:00 p.m. |
| ) | Court: Hon. Virginia K. DeMarchi |

**NOTICE OF MOTION**

TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter as the matter may be heard, the United States will move and hereby moves this Court for entry of an order detaining Defendant Peter Karasev pending trial.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

On October 19, 2023, a federal grand jury in the Northern District of California returned a three-count indictment charging Defendant Peter Karasev (hereinafter "Defendant") with two counts of Destruction of an Energy Facility in violation of 18 U.S.C. § 1366(a) (Counts One and Two) and one count of Use of Fire or an Explosive to Commit a Federal Felony in violation of 18 U.S.C. § 844(h). The charges stem from Defendant's knowing and willful destruction of two PG&E electrical transformers through the use of explosives, which knocked out power to thousands of households and businesses in the San Jose community and caused over $90,000 in PG&E repair costs.  Investigation revealed not only that Defendant constructed, planted, and ignited the explosive devices that destroyed these transformers, but also indicated that the attacks may have been  motivated in part by Defendant's personal frustrations and ties to the ongoing Russian-Ukrainian conflict.  A search of Defendant's home and vehicle revealed enormous amounts of homemade explosive devices and other hazardous chemicals, materials, and tools, and demonstrated that, in the months leading up to the attacks, Defendant was both building and experimenting with improvised explosives and manufacturing methamphetamine in his own home.  As further set forth below, Defendant presents both a danger to the community and a significant flight risk, and there are no conditions or combination of conditions of supervision that can ensure the community's safety and Defendant's appearance before the Court if released.  As such, the government respectfully requests the Court detain Defendant pending trial.

**II.     FACTUAL BACKGROUND**

      **A.     Attacks on Two Electrical Transformers in December and January 2022**

Defendant's charges are based on his bombings of two PG&E electrical transformers in San Jose, California: (1) one on December 8, 2022, at a transformer located near a Macy's department store at the Westfield Oakridge Mall (hereinafter "Oakridge attack"), and (2) the other on January 5, 2023, at a transformer located on Snell Avenue adjacent to the Plaza Del Ray shopping plaza (hereinafter "Snell attack").  Both attacks occurred in the wee hours of the morning in commercial areas occupied by stores and businesses.  The charged bombings were deliberate and premeditated, and collectively deprived

over 1,500 PG&E customers of power and caused over $90,000 in repair costs. Although PG&E initially assumed the outages were caused by internal transformer failures, further investigation eventually revealed that both transformers were destroyed by externally-placed explosive devices, and that Defendant was responsible for the attacks.

The Oakridge attack occurred at approximately 1:30 a.m. on December 8, 2022. Based on a review of the damage by a bomb technician and post-blast expert, the Oakridge transformer was destroyed by the detonation of a fragmentation-producing device that had been placed between the transformer's cooling fins. The explosive device tore two holes in the cooling fins, left fragmentation impact marks (which were consistent with BBs that were later recovered from Defendant's residence), and caused mineral oil coolant to leak out. The damage caused the transformer to overheat and shut down, automatically alerting the power company. PG&E detected an outage at approximately 2:30 a.m. and sent a troubleshooter to respond to the emergency, who observed the leaking oil and requested that the transformer be de-energized before it went "catastrophic." At the time of the Oakridge attack, PG&E assumed that the outage was due to a transformer failure and replaced the transformer without informing law enforcement.[1] The outage affected 1,451 PG&E customers and, due to the extent of the repairs needed, power was not restored until approximately 5:38 p.m. later that day.

The Snell attack occurred around 2:50 a.m. on January 5, 2023, in a strip mall area surrounded by stores and businesses, including a Nob Hill Foods, Round Table Pizza, and a Muslim community center. Compared to the Oakridge attack, the Snell transformer was destroyed by a significantly more powerful explosive device that had been placed at its base, and the explosion caused severe damage to both the transformer and an adjacent building. Based on the blast expert's analysis of recovered evidence at the scene, the Snell explosion was caused by a flash powder-based destructive device inside a bag or backpack. The explosion blew a large hole in the transformer box and shattered the windows of an adjacent dental office. PG&E detected the Snell outage at approximately 3:00 a.m., which affected approximately 55 customers. When the troubleshooter arrived, he noticed similarities to the earlier

---

[1] However, as records later revealed, a security guard in the area called 911 to report hearing an extremely loud explosion approximately 15 minutes prior. At the time, the report was received by the fire department and deemed a transformer failure without further referral to the police.

Oakridge transformer failure and observed damage that led him to suspect the cause was an explosive device. Based on its suspicions of foul play, PG&E reported the incident to law enforcement.

### B. Identification of Defendant as Suspect Responsible for the Attacks

On the same morning of the Snell attack and in response to reports of the explosion, San Jose Police Department (SJPD) responded to the scene and began its investigation. SJPD canvassed the area for surveillance footage, which revealed a single suspect wearing dark clothing and a backpack and arriving on scene by bicycle at approximately 2:48 a.m. As captured in the footage, the suspect placed his backpack towards the bottom of the Snell transformer box, used an ignition source to light it on fire, then fled the scene on his bicycle around 2:53 a.m. After over five minutes of the ignited fire visibly burning, the transformer exploded in a large blast (at approximately 2:57 a.m.). Below is a surveillance footage screenshot depicting the moment of explosion at the Snell transformer:



Additional video footage from various sources in the area captured the same suspect traveling on his bicycle before and after the explosion, establishing his path and timeline of travel to and from the Snell attack. With this information, SJPD sought and obtained a "geofence" warrant[2] to identify any

---

[2] Geofence warrants request information on all devices within a virtual perimeter defined by law enforcement. Geofence warrants generally follow a multistep process to minimize the collection of location data for innocent third parties, during which law enforcement takes steps to narrow the specific customers in which they are interested before requesting more detailed information.

active devices in use during a six-minute window of time in which the bombing suspect was captured riding his bicycle on Pronto Drive in San Jose. Based on the warrant, Google identified only one active device within the targeted area and time period, which was subsequently traced to Defendant. Once Defendant's identity was ascertained, law enforcement discovered that he was a Russian-born naturalized U.S. citizen who was employed as an engineer at Zoox and lived with his partner and their three children at a San Jose home located within a 3-mile radius of both attacks.

Further investigation confirmed Defendant's identification as the individual likely responsible for the two attacks. According to the Google data related to the January 5 bombing, Defendant's phone placed him near the site of the explosion at specific locations and times that were consistent with the travel route of the suspected bomber (as established by the surveillance footage). Furthermore, Defendant's Google search history revealed several incriminating searches surrounding the bombings. For example, on December 8, 2022, at approximately 1:57 a.m., within minutes of the 911 call reporting the explosion, Defendant began searching for "san jose news." Between approximately 2:05 a.m. through 3:03 a.m., Defendant also searched for the terms: "shaped charge"[3] (and accessed the Wikipedia page for this term), "Find or report electric outages – PGE," and "sjfd explosion." Later, on the day of the Snell attack, Defendant was again searching for terms like "san jose explosion," "San jose explosion today," and "pge outage map." Additionally, in the weeks leading up to the attacks, Defendant conducted extensive Google searches related to explosive devices and materials, hazardous chemicals, infrastructure bombings and attacks (both locally and abroad, specifically those with suspected ties to Russia), and news about the Russian-Ukrainian war and political affairs.

**C.    Defendant's Arrest and Searches of Person and Vehicle**

On March 1, 2023, Defendant was arrested by SJPD detectives at his place of employment and transported to SJPD for an interview (briefly described below). At the time of his arrest, Karasev had a small green satchel on his person that contained a clear glass tube with a silver cap. Inside the glass tube was a white crystalline substance, which detectives recognized and seized as suspected crystal methamphetamine.

---

[3] These same words were also found written on a wall/board at Defendant's house and correspond to the type of device that law enforcement believes was used for the bombing.

Defendant's vehicle was also searched during his arrest. In the glove box of his car, law enforcement located a homemade grenade and a pair of M-type devices taped together and fused together with a shared piece of powder train time fuse. M-type devices are powerful destructive devices contained in cardboard cylinders and are usually filled with a black powder or similar energetic material to cause a detonation. In analyzing these items, a bomb technician reported that the effect of taping the devices together greatly increased their explosive effects and the risk of injury or death to any person in proximity of the explosion. On the center of the dashboard of the car, law enforcement also located two handheld, remote controllers with telescoping antennas with on/off buttons. As noted in the bomb technician's report, bomb builders are known to utilize similar wireless transmitters to remotely detonate IEDs (improvised explosive devices).

**D.     Searches of Defendant's Home and Office**

On March 2, 2023, SJPD and several special operations teams executed a search of Defendant's residence. Due to the extent and volatility of the substances and items located at the residence and concerns for officer safety, the search of Karasev's home took significantly longer than usual (approximately four days) and required the assistance of several other agencies, including FBI, DEA, ATF, and the National Guard. The house was in a state of significant disarray, with homemade explosive devices, unidentified chemicals, and unsecured firearms located throughout the home, and exposed electrical wiring running along the outside of the house and on the roof.

The evidence recovered from the residence included:

- Multiple firearms and weapons, including a Wesson, Stevens and Miller Shotgun, an AK-47 Style Century Arms Rifle, a Ruger .223 Rifle, a 37mm Tac-79 Launcher, and a Taurus Forjas 45 Cal Pistol "1911";

- Several homemade destructive devices in different stages of completion, including an incomplete steel pipe bomb, a homemade mortar (constructed out of a syringe and cardboard tube with rocket fins at the base) in the laundry room, flash powder (a highly explosive material) along the floor of the laundry room, and a homemade grenade (constructed out of a small plastic jar capped by a nut and bolt) in the refrigerator;

- Over 300 pounds of explosive precursor materials and hazardous chemicals, powders, and

substances;

- A methamphetamine lab in the garage, with drug manufacturing equipment and suspected drugs, including finished methamphetamine product;
- A bicycle that resembled the same one ridden by the suspected bomber as captured in the surveillance videos.

Subsequent lab analysis confirmed that all but one of the destructive devices removed from Defendant's home were filled with a flash powder/smokeless powder combination. Furthermore, while the bomb squad was conducting a walkthrough of Defendant's residence, they noticed heavy modifications to the house's natural gas system in which Defendant had apparently created an improvised torch attached directly to the house's main gas source using PEX piping (which is normally only rated and used for interior water lines). Had the improvised system failed, the bomb squad assessed that it would have caused a significant gas leak that would have endangered the primary residence and surrounding houses.

At Karasev's office, officers seized around a dozen unopened packages, which included multiple large containers of hazardous chemicals, packages of black powder and other propellants, and hundreds of muzzleloading rifle charges. The bomb squad determined that all the above materials were hazardous chemicals or explosives and disposed of them accordingly.

### E. Interview Statements and Evidence of Other Potential Explosive Devices

In the course of its investigation, law enforcement conducted several interviews that provided additional insight into the extent of Defendant's conduct and his motives. Some of the relevant statements obtained include those of Defendant, his wife/partner ("N.Z."), as well as an associate to whom Defendant had previously provided explosive devices ("D.L.").

During his interview with SJPD, Defendant spoke about testing and setting off rockets in his backyard and on the bicycle trail near his house and also asserted he had been using methamphetamine as a replacement for Adderall during the Adderall shortage. Additionally, Defendant mentioned he had been having a difficult time with the current conflict between Russia and Ukraine because he had family in both countries, and compared it to parents getting a divorce.

In her statements to law enforcement, N.Z. advised that she had seen Defendant experimenting

7

with glass objects and other objects at home, and knew he was interested in rocketry and firearms, but did not know or understand what he was doing or condone his activities. N.Z. stated she was regularly trying to keep hazardous things in the home away from their children and that she thought Defendant's hobbies were risky because they lived in a densely populated area. N.Z. also noted that Defendant frequently consumed media concerning Russia and Ukraine and was often upset when doing so, and specifically recalled that Defendant discussed the Wagner Group several times as well as the one-year anniversary of the Russian-Ukrainian conflict. According to N.Z., in the several months before his arrest, Defendant began receiving numerous packages and would often go on late night bicycle rides. When asked if she recalled anything regarding Defendant's activities on the mornings of the bombings, N.Z. refreshed her memory on those dates by reviewing her texts, which showed that, minutes before the Snell bombing, Defendant texted N.Z., "Bike ride / getting rid of unsafe box." N.Z. also recalled that, when Defendant returned from the bike ride that early morning, he made some reference to the conflict in Ukraine and expressed a statement to the effect of "why should everyone feel safe." Of concern, N.Z. also mentioned that she thought there might have been a third possible bombing around September 2022 because she recalled Defendant bragging about the incident to D.L., and believed that Defendant may have even given D.L. an explosive device. N.Z. stated that she and Defendant knew D.L. because he supplied them with methamphetamine.

A search of both Defendant's and D.L.'s phones revealed text discussions between them in September and October 2022 referencing an explosive device that Defendant had given to D.L. and encouraged D.L. to use. D.L., who is in custody in San Francisco County Jail for an unrelated crime, provided a statement to law enforcement in which he confirmed that Defendant had provided him an explosive device to use, but claimed he had abandoned it in a garbage dumpster near a Whole Foods.

### III. LAW AND ARGUMENT

The Bail Reform Act of 1984 ("the Act") provides that the Court "shall order the detention of the person before trial" if the Court finds "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is required where a defendant is either a flight risk or a danger to others. *See, e.g., United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is

a flight risk need only be supported by a preponderance of the evidence. *Id.* at 1406. A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. *See* 18 U.S.C. § 3142(f).

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible, and consideration of factors outside the articulated factors set forth in 3142 is also disfavored. *Id.* The factors under § 3142(g) to be considered by the Court in determining whether pretrial detention is warranted are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Consideration of the § 3142(g) factors demonstrates that detention is appropriate in this case based on both Defendant's danger to the community and his risk of non-appearance. The nature and circumstances of the offense, the weight of the evidence, and Defendant's personal history and characteristics support this conclusion and weigh in favor of pretrial detention.

### A.    Defendant's Danger to the Community

The nature and circumstances of Defendant's offenses in this case are extremely serious, and demonstrate that he poses a significant danger to others and the community if released. Based on the charged conduct, Defendant has demonstrated that he possesses both the skillset and willingness to construct and use explosive devices to destroy energy infrastructure and wreak significant harm on the community. The two charged bombings alone affected thousands of households and businesses in the San Jose area, depriving these victims of electricity—a basic necessity to modern life upon which countless rely for their health and livelihood. Furthermore, these attacks were planned and executed as part of a course of conduct by the Defendant in which he researched, experimented with, and built

various homemade destructive devices and other explosives in his home, then detonated them in public areas. The evidence also indicates that Defendant deliberately targeted infrastructure facilities and carried out these attacks with the intent to cause disruption and due (at least in part) to his desire for Americans to experience some of same fear, insecurity, and suffering that those in the Russian-Ukranian conflict were presumably experiencing. In addition to the two charged bombings, Defendant was found with an alarming cache of explosive devices and materials in both his house and car, and even previously supplied a device to his drug dealer, D.L., which he encouraged D.L. to use. The nature and extent of Defendant's conduct—in particular, his willingness and ability to plant and use explosives in commercial areas and on infrastructure targets—demonstrate that no condition or combination of conditions will reasonably assure the safety of the community if Defendant is released.

The weight of the evidence also favors detention. Based on the indictment, the grand jury has already found probable cause to believe that Defendant committed the charged crimes, including that he knowingly and willfully destroyed energy facilities and used fire and explosives to do so. *See, e.g.,* ECF No. 1 (Indictment). Furthermore, as the United States has proffered in this memorandum, the case against Defendant is overwhelmingly supported by a range of evidence, including video surveillance, location data, cellphone communications, explosive devices and other materials found in Defendant's home and vehicle, expert analyses, and witness statements.

Finally, the history and characteristics of Defendant further demonstrate his danger to the community. Defendant is a highly educated engineer with a doctorate degree who apparently possesses an advanced technical skillset that gives him the capacity to impose significant harm to the safety of the community. Defendant not only has a deep interest in firearms, rocketry, and explosives, but was found in possession of several dangerous weapons, including assault rifles, homemade bombs, and a grenade launcher. Although Defendant does not have any criminal convictions, he has been the subject of several law enforcement investigations for child neglect as well as for brandishing a firearm. He also has a history of drug use, and even manufactured methamphetamine in his own home. Taken together, these factors demonstrate that Defendant has the inclination, wherewithal, and unpredictability to pose a serious danger to others and the community. No conditions or combination of conditions can ensure the safety of the community should he be released.

### B. Defendant's Risk of Non-Appearance

The nature and seriousness of the charged offenses, as well as Defendant's personal history and characteristics, also support the finding that Defendant presents a flight risk. Based on his current charges, Defendant faces a mandatory minimum term of imprisonment of ten years on Count Three, consecutive to any sentence imposed on Counts One and Two. A guideline sentence for Defendant, even with credit for acceptance of responsibility, would be more than 14 years. Given the significant amount of custodial time that Defendant is facing (even without considering his pending state charges), Defendant has a considerable incentive to flee.

Furthermore, Defendant has few to no remaining ties to this area and district, which previously existed through his work, home, and family. Following his arrest by state law enforcement in March 2023, defendant is no longer employed at Zoox, and his partner, N.Z., has returned to Georgia (where her family lives) with the children. Should he be released, defendant's own home in the area does not appear to be a livable option, given the dangerous chemicals and equipment that Defendant kept there, as well as the custom modifications he made that rendered it unsafe—all of which required several of Defendant's neighbors to evacuate when the home was searched. In fact, based on media reports, Defendant's home was recently listed for sale on the real estate market, demonstrating his lack of intent to continue residing in his Bay Area home should he be released.[4]

Finally, Defendant is a Russian-born naturalized citizen who speaks fluent Russian, has ample means, and still has significant contacts and family abroad, all of which further suggest his ability to flee the country and seek refuge abroad. These factors, in combination with the serious criminal penalties that Defendant is potentially facing, makes it more likely than not that Defendant poses a flight risk such that detention is warranted.

### IV. CONCLUSION

In light of the foregoing, the United States respectfully moves to detain Defendant as both a risk of flight and a danger to the community.

---

[4] *See, e.g.*, Annie Vainshtein, "Bay Area house where meth, bombs were allegedly made is listed for $1.5 million," S.F. Chronicle (Oct. 24, 2023), *available at* https://www.sfchronicle.com/bayarea/article/meth-lab-house-san-jose-bombings-zillow-18444727.php

11

Respectfully submitted,

ISMAIL RAMSEY
United States Attorney

*/s/ Anne C. Hsieh*
ANNE C. HSIEH
Assistant United States Attorney