JODI LINKER
Federal Public Defender
Northern District of California
DEJAN M. GANTAR
Assistant Federal Public Defender
8th Floor, Suite 820
55 South Market Street
San Jose, CA 95113
Telephone:    (408) 291-7753
Facsimile:    (408) 291-7399
Email: Dejan_Gantar@fd.org

Counsel for Defendant
KARASEV

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. CR 23–364 BLF |
| Plaintiff, | |
| v. | **DEFENDANT PETER KARASEV'S SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE REPORT** |
| PETER KARASEV, | |
| Defendant. | **Court:**        Courtroom 1, 5th Floor |
| | **Hearing Date:**  December 16, 2025 |
| | **Hearing Time:**  9:00 a.m. |

1

**TABLE OF CONTENTS**

2

**INTRODUCTION**........................................................................................................ 1

3

**ARGUMENT** ............................................................................................................... 2

4

     I.     THE COURT SHOULD ACCEPT THE PLEA AGREEMENT AND IMPOSE A
           SENTENCE OF 102 MONTHS. ................................................................. 2

5

6

        A.     The Court should give Mr. Karasev the benefit of his bargain and accept the plea
               agreement. ................................................................................ 2

7

        B.     The Court should impose a sentence of 102 months. ........................................ 3

8

              1.     Peter Karasev's personal history and characteristics. ............................... 4

9

                    a.     Mr. Karasev's upbringing, education, and career. ............ 4

10

                    b.     Peter Karasev's robust social support network. ............... 5

11

                    c.     Peter Karasev's struggle with mental health and substance
                         abuse. ................................................................. 6

12

13

              2.     The nature and circumstances of the offense warrant the requested
                 sentence. ................................................................................. 7

14

              3.     Mr. Karasev's post-offense rehabilitation, acceptance of responsibility,
                 and low risk of recidivism ............................................................ 9

15

16

              4.     The Court should account for Mr. Karasev's pending state court
                 proceeding, and order that the sentence run concurrent to any sentence
                 imposed in that case. .................................................................. 11

17

18

     II.     THE COURT SHOULD RESOLVE THE PARTIES' OBJECTIONS TO THE PSR IN
           THE DEFENSE'S FAVOR. ..................................................................... 14

19

     III.    OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE. .............................. 15

20

**CONCLUSION** ........................................................................................................... 17

21

22

23

24

25

26

27

28

1

### TABLE OF AUTHORITIES

2

**Cases**

3
*In re Morgan*, 506 F.3d 705 (9th Cir. 2007)............................................................2

4
*Kimbrough v. United States*, 552 U.S. 85 (2007) .................................................2, 3

5
*Pepper v. United States*, 562 U.S. 476 (2011) ........................................................3

6
7
*Pinaud v. James*, 851 F.2d 27 (2d Cir. 1988) .......................................................12

8
*Taylor v. Reno*, 164 F.3d 440 (9th Cir. 1998) .......................................................13

9
*Thomas v. Brewer*, 923 F.2d 1361 (9th Cir. 1991) ...............................................13

10
*United States v. Johnson*, 529 U.S. 53 (2000) ......................................................16

11
*United States v. Miller*, 722 F.2d 562 (9th Cir. 1983) ...........................................2

12
*United States v. Papke*, 149 F.4th 1169 (10th Cir. 2025) .......................................2

13
*United States v. Quinzon*, 643 F.3d 1266 (9th Cir. 2011) ....................................16

14
*United States v. Setser,* 566 U.S. 231 (2012) ......................................................14

15
*United States v. Weber*, 451 F.3d 552 (9th Cir. 2006) ..........................................16

16
*United States v. Wilson*, 503 U.S. 329 (1992) ......................................................13

17

**Statutes**

18
18 U.S.C. § 1366...................................................................................................1

19
18 U.S.C. § 3553................................................................................................2, 3

20
18 U.S.C. § 3583.................................................................................................16

21
18 U.S.C. § 3584.................................................................................................14

22
18 U.S.C. § 3585.................................................................................................12

23
18 U.S.C. § 844................................................................................................1, 3

24

25

**Other Authorities**

26
Mizoguchi, H., & Yamada, K., "Methamphetamine Use Causes Cognitive Impairment And Altered Decision-Making," *Neurochemistry International*, Vol. 124 (Mar. 2019)...............................................7

27
28
U.S. Sentencing Commission, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010

1
(Sept. 2021) ....................................................................................................................9

2
**Rules**

3
Fed. R. Cr. P. 11 ...........................................................................................................2

4
**U.S. Sentencing Guidelines**

5
USSG § 5D1.1 ..............................................................................................................16

6
USSG § 5D1.3 ..............................................................................................................16

7
USSG § 5G1.3 ..............................................................................................................14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Peter Karasev is a gifted and accomplished engineer and loving father. Mr. Karasev took an interest in science at an early age, excelled academically, and eventually earned a PhD in engineering from the Georgia Institute of Technology. Equipped with an advanced degree, and an exceptional work ethic, for years he was employed as a software engineer with several technology companies in the Bay Area. As evidenced by the support letters from the people who are closest to him—and who know him best—Mr. Karasev's conduct of damaging two PG&E transformers with the use of explosives came as a shock to everyone, for it was deeply out of character for him. Mr. Karasev is known as a kind, supportive, and dedicated father, son, and friend.

Around 2020 and into 2021, in the midst of the Covid pandemic, things began to go wrong. Mr. Karasev struggled with enormous pressure to perform at work, and unrelenting stress arising from being the sole provider for his young family in the Bay Area. Moreover, a national Adderall shortage—███████████████████████████—led him to seek out and eventually begin abusing methamphetamine as a substitute for a medication that he had relied on since he was very young. He was also suffering with other untreated and undiagnosed mental illnesses at the time, and his mental health began to exceedingly decline. Not surprisingly, his newly developed methamphetamine addiction only compounded his untreated mental health issues. Due to the lack of any support or intervention to impede his declining mental health, combined with his inclining substance abuse, Mr. Karasev began to spiral. His interest in pyrotechnics and chemistry became an obsession that then in turn led to risky chemistry experiments in his garage: tinkering with pyrotechnic materials and chemicals, creating powerful fireworks and explosives, and eventually, the reason for why he is before the Court now, using them to damage two PG&E transformers.

Mr. Karasev has accepted responsibility for his conduct. He now comes before the Court, having pled guilty to two counts of Willful Destruction of an Energy Facility, in violation of 18 U.S.C. § 1366(a). The parties have negotiated a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), by which the Government, amongst other things, has agreed to dismiss Count Three—an alleged violation of 18 U.S.C. § 844(h), Use of Fire or an Explosive to Commit a Federal Felony, which would have carried a 10-year mandatory sentence. The parties have agreed to

1   recommend a sentence between 102-126 months. Probation recommends a sentence of 102 months.

2       The defense respectfully requests, for the reasons set forth below, the Court accept the plea

3   agreement, adopt Probation's recommendation, and impose a sentence of 102 months. The requested

4   sentence is in accordance with 18 U.S.C. § 3553(a), and is "sufficient, but not greater than necessary"

5   to account for Mr. Karasev's circumstances and his conduct and role in this case. *Kimbrough v. United*

6   *States*, 552 U.S. 85, 101 (2007).

7                                              **ARGUMENT**

8   **I.    THE COURT SHOULD ACCEPT THE PLEA AGREEMENT AND IMPOSE A**
        **SENTENCE OF 102 MONTHS.**

9
        **A.    The Court should give Mr. Karasev the benefit of his bargain and accept the plea**
10            **agreement.**

11      The parties have negotiated a plea agreement pursuant to Federal Rule of Criminal Procedure

12  11(c)(1)(A) and (c)(1)(C). In other words, the parties have agreed to a "charge bargain," whereby Mr.

13  Karasev will not stand convicted of the most serious charge alleged in the indictment, Count Three,

14  Use of Fire or an Explosive to Commit a Federal Felony in violation of 18 U.S.C. § 844(h), which

15  carries a mandatory consecutive sentence of ten years. At the same time, the parties have agreed to be

16  bound by a sentencing range—here, between 102 and 126 months—which becomes binding on the

17  Court if the plea agreement is accepted. *See* Fed. R. Cr. P. 11(c)(1)(C); *In re Morgan*, 506 F.3d 705,

18  708-09 (9th Cir. 2007) (explaining procedure for Rule 11(c)(1)(C) agreements).

19      "Charging decisions are generally within the prosecutor's executive domain[,]" and "courts

20  should be wary of second-guessing prosecutorial choices." *United States v. Miller*, 722 F.2d 562, 565

21  (9th Cir. 1983); *see also Morgan*, 506 F.3d at 710-11. As such, "the specific rule governing

22  prosecutorial charging decisions gives courts only a limited supervisory power over such decisions."

23  *Miller*, 722 F.2d at 565-66. "That rule requires courts to grant prosecutors leave to dismiss charges

24  unless a dismissal is clearly contrary to manifest public interest." *Id.* at 566 (cleaned up). As such, the

25  "zone of judicial discretion to reject a charge bargain is quite limited." *United States v. Papke*, 149

26  F.4th 1169, 1188 (10th Cir. 2025).

27      Here, the defense respectfully requests the Court accept the plea agreement. The plea

28  agreement allows Mr. Karasev to forgo having to plead guilty to the most serious count, which would

bind the Court and prohibit it from imposing any sentence below ten years (consecutive to the sentences imposed on Counts One and Two). At the same time, the plea agreement ensures that Mr. Karasev will receive a severe penalty of between 102 and 126 months, a sentence well above the guidelines, which Probation calculates at 37-46 months in the PSR.

The plea agreement is appropriate because Mr. Karasev's natural guidelines would have been substantially higher if he were convicted of Count Three. That's because the statute charged in Count Three would require the Court to impose a ten-year term *consecutive* to Counts One and Two. *See* 18 U.S.C. § 844(h). As such, the relevant guideline, USSG § 2K2.4(a), would call for a mandatory guideline sentence of ten years, consecutive to the guidelines for the underlying counts, which Probation has calculated at 37-46 months. Because Mr. Karasev is CHC I, this would have resulted in an advisory sentencing range of 157-166 months.

Moreover, as part of the plea bargaining process, the parties agreed to forego what would likely have been lengthy and resource-intensive litigation on novel issues presented in this case. In part in exchange for Mr. Karasev's agreement to not litigate those issues, the Government agreed to the sentencing disposition set forth in the plea agreement. Consistent with his broader acceptance of responsibility, Mr. Karasev agreed to plead guilty, and allow the Government to preserve substantial resources which would have been necessarily expended on such litigation. For the foregoing reasons, the defense respectfully requests the Court accept the plea agreement.

### B.    The Court should impose a sentence of 102 months.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Id.* The Court is thus charged under 18 U.S.C. § 3553(a) to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." *Kimbrough*, 552 U.S. at 101 (quotation marks

1    omitted; emphasis added). The defense respectfully submits that a sentence of 102 months is sufficient,

2    but not greater than necessary, to satisfy the sentencing goals of section 3553(a).

          **1.**       **Peter Karasev's personal history and characteristics.**

          **a.**       **Mr. Karasev's upbringing, education, and career.**

       Peter Karasev was born and spent his very early childhood years in Moscow, Russia, at a time when the region was engulfed in political chaos arising from the collapse of the Soviet Union. Mr. Karasev and his family experienced first-hand the social upheaval and political instability present in Russia in the early 90's, which ultimately led the family to seek better opportunities in the United States. The family moved to the States when Peter was only 5 years old. PSR ¶ 42.

       As a young child, Mr. Karasev was immersed in a new country with a different language and culture that varied greatly from what he was used to in Russia. *Id.*; *see also* Report of Dr. John Greene ("Greene Report") at 2, attached here under seal as Exhibit A. It was stressful leaving his life behind in Russia and he had a hard time adjusting in the United States, especially given the language barrier. *Id.*; PSR ¶ 42. Mr. Karasev experienced bullying in school for speaking Russian and not being fluent in English.

       Due to his parents' jobs, the family moved around a lot when Mr. Karasev was a child. Ex. A, Greene Report at 2. The frequent moves caused him to experience isolation and led to a lack of social support outside of family. This caused him to not feel secure, safe, and supportive during his core developmental years. From a young age, however, he showed an interest in science and experiments, and excelled in science club in school. It was there—tinkering with experiments and working on challenging questions—that he found his solace when he otherwise felt isolated.

       This deep interest in science and schoolwork ultimately led Mr. Karasev to excel in academia. He obtained a B.A., Master's, and PhD in electrical and computer engineering from the Georgia Institute of Technology. PSR ¶ 55.

       Shortly after acquiring his doctorate, Peter started a family with his partner, Natalie Zerr. The two began dating in 2015, and now share three children.[1] During that time, he built on his strong work ethic—his first job was at McDonald's, a job he maintained throughout his entire high school tenure,

---

[1] Ms. Zerr currently resides with the children in Georgia. Mr. Karasev speaks to his children daily.

Ex. A, Green Report at 3—and secured a career in software engineering. Indeed, beginning in 2013, and up until his arrest in this case, he maintained a successful career in that industry working at various technology companies. PSR ¶¶ 56-59.

b.    **Peter Karasev's robust social support network.**

Several letters of support, attached here as Exhibit B, demonstrate that Mr. Karasev has a strong support network that will ensure his readjustment to the community is smooth, and that he does not engage in the sort of conduct at issue here ever again. There is a common thread that runs through these letters: Mr. Karasev is described as responsible, reliable, thoughtful, and loving. His parents share the sentiment set forth in virtually all of these letters—"the news of [Peter] committing the crimes came as a shock to [them] and was very hard to swallow." Ex. B, Alexander Karasev & Olga Nikolaeva Letter. They describe him as a productive member of [] society," and a "caring father," whose conduct was "out of [] character." *Id.*

Mara Underwood, his former partner and mother to one his children, writes that over the years, Mr. Karasev has "demonstrated reliability, responsibility, and emotional stability." *Id.*, Mara Underwood Letter. She further describes him as "level headed and thoughtful." *Id.* Ms. Underwood believes that his conduct was the result of a "mental health crisis or break[,]" and that with the appropriate support and treatment going forward, he would readily adjust to his former self—being a productive and contributing citizen. *Id.*

Daniel Greidinger, a close friend of Mr. Karasev's who has known him for almost 10 years, likewise speaks highly of his attributes, describing him as "loyal, supportive, and always willing to lend a hand[,]" and "someone who looks out for others and wants the people in his life to thrive." *Id.*, Daniel Greidinger Letter. Mr. Karasev has confided in his friend, "expressed real remorse," and has never minimized his conduct. *Id.* Mr. Greidinger believes that with the right treatment and infrastructure going forward, Mr. Karasev will "not repeat this kind of behavior." *Id.*

Remarkably, even those who weren't *close* to Mr. Karasev—but worked with him—were shocked by his conduct given what they knew about his character. Christian Potthast was Mr. Karasev's manager at his former employer, the Toyota Research Institute. *Id.*, Potthast Letter. He describes Mr. Karasev as "intelligent and accomplished[,] [and] highly regarded." *Id.* His work ethic

1  was strong and he was "always willing to help with questions from colleagues." *Id.* He was described

2  within his office as "supportive, a very good problem solver, and a quick learner." *Id.* Again, Mr.

3  Potthast agrees—he was surprised when hearing of Mr. Karasev's conduct, finding it to be "completely

4  out of character[,]" and not reflective of who Mr. Karasev truly is—someone who is full of integrity,

5  kindness, a strong sense of responsibility and a genuine desire to contribute positively to society. *Id.*

6  Mr. Potthast is confident that he "has the intelligence, skills, and good character necessary to rebuilt

7  his life and once against become a productive member of society." *Id.*

8             **c.**    **Peter Karasev's struggle with mental health and substance abuse.**

1 ███████████████████████████████████████████████████████████

2 ████████████████████████████████████.

3    Mr. Karasev's history of substance use—which began at an early age in an effort to self-

4 medicate—only added to the difficulties he struggled with in the face of his mental health conditions.

5 As reported to Probation, Mr. Karasev began using methamphetamine when he was young, although

6 his methamphetamine use significantly increased not long before the offense conduct at issue, during a

7 national Adderall shortage. PSR ¶ 54; Ex. A, Greene Report at 5. It was at that point that he went back

8 to using methamphetamine, initially as a way to address ███████████████. At first, Mr. Karasev's

9 methamphetamine use leading up to his arrest greatly impacted his personal relationships and he was

10 withdrawn, *id.,* but later his use spiraled out of control, and he was eventually using the drug daily for

11 about two years leading up to his arrest.

12    Studies have indicated that individuals addicted to methamphetamine exhibit impaired

13 cognitive functioning, attention impairment, social cognition, flexibility, working memory, and

14 remodeling of brain circuits of the reward system. *See e.g*., Mizoguchi, H., & Yamada, K.,

15 "Methamphetamine Use Causes Cognitive Impairment And Altered Decision-Making,"

16 *Neurochemistry International*, Vol. 124 (Mar. 2019), abstract available at

17 https://www.sciencedirect.com/science/article/abs/pii/S01970186183045X. Clearly, Mr. Karasev's

18 intense abuse of the drug caused such symptoms here.

19         **2.    The nature and circumstances of the offense warrant the requested**
20                **sentence.**

21    Mr. Karasev acknowledges the seriousness of the offense conduct to which he's admitted. He

22 respects how dangerous it was and he has accepted full responsibility for it. Still, the record shows that

23 this conduct, and the behavior leading up to it, was aberrational. Moreover, several mitigating

24 factors—including circumstances underlying the offense itself—warrant imposition of the mitigated

25 end of the sentencing range agreed to by the parties.

26    Again, Mr. Karasev acknowledges the dangerousness of his conduct—damaging two PG&E

27 transformers through the use of explosive devices, and storing hazardous materials and other

28 destructive devices inside his home with children present. However, the record clearly reflects Mr.

1  Karasev's decisions to damage the transformers in the dead of night, when no one would be around,

2  and therefore ensuring no one would be injured. Indeed, no one was, thankfully, injured. Also notable

3  is that out of the 1,451 customers who lost power on December 8, 2022, the vast majority of them had

4  their power restored fairly quickly, although it took until the following day to restore power to *all*

5  customers. *See* PG&E Report, attached here under seal at Exhibit E (reflecting the majority of

6  customers (1,421) had their power back on by 2:50 a.m., *i.e.,* only 16 minutes after the first "no light"

7  occurred); PSR ¶ 6.

8          Mr. Karasev was under the heavy influence of methamphetamine during the commission of the

9  instant offense and for several months leading up to it. He was spiraling—abusing methamphetamine,

10 not treating his mental illness. His stress from the combined pressure at work and pressure to

11 financially provide for his family led to further erratic behavior. Ex. A, Greene Report at 7. This erratic

12 behavior included spending time in his garage, tinkering with pyrotechnics and making explosive

13 devices.

14         Mr. Karasev's episodic and erratic behavior—uncharacteristic for him—was perceived by

15 others closest to him. His partner, Ms. Zerr, reported that his responsibility began to decline after the

16 pandemic—he began to accrue debt, and maxed out his credit cards. *Id.* at 8. He stopped socializing

17 and became isolated. *Id.* at 9. By contrast, before all of this, when Peter was being treated for his

18 mental health issues and before he began abusing methamphetamine, he was dependable and

19 responsible. *Id.*

20         Ms. Underwood, like many others, observed a change in Mr. Karasev around the time the

21 offense conduct was committed. Ex. B, Underwood Letter. She noticed he became "withdrawn,

22 disoriented, and displayed unusual patterns, and that his energy and demeanor were drastically

23 different from the stable and attentive person [she] had known for over a decade." *Id.*

24         Mr. Greidinger agrees the conduct underlying this offense was out of character for him, and

25 that the cacophony of stressors present in his life at the time created "a perfect storm[,]" resulting in "a

26 mental health crisis compounded by difficult external circumstances." *Id.*, Greidinger Letter. To that

27 end, Mr. Greidinger emphasizes that Mr. Karasev "has never subscribed to any hostile or extremist

28 ideologies." *Id.* Importantly, Mr. Potthast also witnessed Mr. Karasev's mental health decline in the

1    time leading up to the offenses—he was struggling with isolation and the challenges of parenting

2    during the Covid shutdown—all further compounded by the fact that he was the sole provider for his

3    family in a community known for its extremely high cost of living. *Id.*

4         This kind of episodic behavior was not entirely uncommon for Mr. Karasev, although the

5    intensity of this particular episode was. ████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████████

8    ██████████████████████████████████

9         Mr. Karasev's erratic behavior reflects an individual in the depths of addiction and mental

10   turmoil. Importantly, his conduct was not politically motivated, or done with an intent to cause fear or

11   terror in the community. Instead, the evidence shows that Mr. Karasev was in the midst of a mental

12   health crisis, compounded by his methamphetamine abuse. His interest in pyrotechnics developed into

13   a fascination with experiments and tinkering with hazardous chemicals in his garage and making

14   homemade fireworks—ultimately leading to their use, on two separate occasions. The nature and

15   circumstances of the offense warrant the requested sentence.

16              **3.    Mr. Karasev's post-offense rehabilitation, acceptance of
                        responsibility, and low risk of recidivism.**

17

18         Prior to the instant offense, Mr. Karasev had no criminal history. In light of the fact that this is

19   his only period of incarceration, the defense submits a sentence of 102 months is appropriate.

20   Furthermore, the requested sentence would enable him to receive the most comprehensive access to

21   necessary services to treat his mental health issues and ensure that his past addiction does not repeat

22   itself in the future, while he is still relatively young. Mr. Karasev is 39 years old. Depending on how

23   the BOP calculates his pretrial custody credits, the defense anticipates that a sentence of 102 months

24   would result in his release when he is in his mid-40's. A recent report by the U.S. Sentencing

25   Commission concluded that offenders in the lowest criminal history categories—like Mr. Karasev,

26   who is a CHC I—had the lowest re-arrest rates, and that the overwhelming majority of those rearrested

27   following incarceration were younger than age 21 at time of release. *See* U.S. Sentencing Commission,

28   RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (Sept. 2021), available here:

1  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
2  publications/2021/20210930_Recidivism.pdf.

3        As the Court is aware, for defendants in pretrial detention, rehabilitation opportunities are

4  limited. However, Mr. Karasev has taken full advantage of everything that has been made available for

5  him during his pretrial incarceration. His long-term goals are to maintain stable employment in the

6  engineering field and to reunite with his partner, Natalie, and all five of his children. He has, during his

7  period of pretrial detention, successfully completed a series of rehabilitation-oriented courses, and

8  engaged in therapy, which have collectively helped him learn skills to reduce stress and increase

9  prosocial behaviors, and learn healthier coping strategies. He also has been participating in substance

10 abuse classes twice a week since September 2025.

11       Mr. Karasev's efforts in rehabilitation show his commitment to wanting to grow from his past

12 mistakes and learn healthy coping mechanisms to break his cycle of addiction. Mr. Karasev wants to

13 be there for his family and show not only himself but the Court that he has the ability to be a sober and

14 productive member of the community.

15       Critically, Dr. Greene has concluded, based on a forensic psychiatric evaluation of Mr.

16 Karasev, that if he "continues psychiatric treatment and continues to maintain sobriety from

17 amphetamine, he will continue to present as a low risk for recidivism." Ex. A, Greene Report at 10; *see*

18 *also* PSR ¶ 52. Dr. Greene's medical conclusion is based primarily on five factors: that the behavior

19 underlying the offense and his interest in explosives was "predominantly related to amphetamine

20 intoxication"; that his behavior leading up to the offense dates, as corroborated by other evidence, was

21 the result of methamphetamine addiction; that he is being treated for mental illness which contributed

22 to impairments in judgment; that his personal history (and general lack of criminal history) indicated

23 an absence of past criminal behavior; and that he did not suffer with any other mental impairments that

24 would increase risk in any future criminal behavior or violence. *Id.* at 11.

25       Moreover, Dr. Greene has concluded that "Mr. Karasev's actions leading to his instant offense

26 were not reflective of politically-motivated anger," but rather by his interest in fireworks and

27 pyrotechnics, which were exacerbated through his use of methamphetamine. *Id.* at 11-12.

28       Mr. Karasev has fully accepted responsibility for his conduct and appreciates its seriousness.

He submits, through counsel, the following acceptance statement:[2]

> I am so profoundly sorry for all my actions on December 8th 2022 and January 5th 2023. I damaged the PG&E transformers using explosives and take full responsibility for this. At the time of my offense I was high on crystal meth. Now that I have been clean and sober for two years, I see that I committed a serious offense. I look forward to getting my debt to society paid off. Upon my release I plan to focus on being there for my kids. I will try to find a job in software engineering. If this is not possible due to my record, my backup plan is to go into a skilled trade like plumbing. And of course, I will stay away from drugs. I apologize to everyone that I wronged by my actions.

Mr. Karasev's position regarding restitution is consistent with this genuine acceptance of responsibility. In his plea agreement, Mr. Karasev agreed to pay restitution in an amount no less than $104,076. *See* Plea Agreement ¶ 10. However, PG&E has since increased its claims substantially to $200,293.67, resulting in an increase in total amount of restitution sought to $214,880.67. PSR ¶ 15. Mr. Karasev will not contest this amount, or seek a restitution hearing—instead, acknowledging his conduct resulted in significant losses, he agrees the Court set restitution in that amount. The defense respectfully requests, however, that the Court waive any interest on restitution under 18 U.S.C. § 3612(f)(3)(A). Mr. Karasev is indigent, represented by appointed counsel, and does not have the means or ability to pay interest on restitution. In addition, the Court should order that payment of restitution, or any other criminal monetary penalties, not be due during any period of imprisonment.

In summary, Mr. Karasev has expressed sincere remorse for his actions, and despite the dangerous nature of his conduct, he never had any intention of harming anyone. He has been receiving treatment for his mental health conditions, and has been sober, and the requested sentence will ensure he remains on that path, affirming what this record demonstrates—that he presents a low risk of recidivism, and that he will never repeat conduct of this sort again.

### 4.    The Court should account for Mr. Karasev's pending state court proceeding, and order that the sentence run concurrent to any sentence imposed in that case.

When he was arrested on March 1, 2023, Mr. Karasev was originally charged in Santa Clara

---

[2] This statement has been provided to Probation, however, was not included in the final PSR. Accordingly, counsel includes it here.

County state court for the same conduct alleged in this case. That case had been pending for approximately seven months when the Government indicted him on October 19, 2023. Shortly thereafter, on November 7, 2023, Mr. Karasev first appeared before the magistrate court pursuant to a writ of habeas corpus ad prosequendum. *See* ECF 3, 5. He was ordered detained, and he has been in the custody of the U.S. Marshal since then. The state case remains pending.

When fashioning an appropriate sentence, the Court should account for the fact that, depending on the resolution reached in the state matter, Mr. Karasev may serve substantially more time than the requested sentence, because the BOP may not give him pretrial credit toward that sentence. The BOP is responsible for federal sentencing computation decisions. The statute governing sentence computations, 18 U.S.C. § 3585(a), provides:

(a) Commencement of Sentence.—

A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.

(b) Credit for Prior Custody.—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

(1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

*that has not been credited against another sentence.*

18 U.S.C. § 3585(a) (emphasis added).

The underlying principle of § 3585(a) is that a federal sentence commences—and the defendant begins receiving "credit" for that sentence—when a defendant is received by the United States for the purpose of serving a federal sentence. *See Pinaud v. James*, 851 F.2d 27, 30-31 (2d Cir. 1988).

Under the primary/secondary jurisdiction doctrine, the sovereign that first arrests the defendant has primary custody, unless and until that custody is relinquished to another sovereign. *Taylor v. Reno*,

164 F.3d 440 (9th Cir. 1998). Importantly, a federal sentence isn't deemed to begin running when a defendant is detained and produced in federal court by way of a federal writ from state custody. *Thomas v. Brewer*, 923 F.2d 1361, 1366-67 (9th Cir. 1991). Put differently, time spent in the custody of the U.S. Marshal pursuant to a writ from state custody does not qualify as federal custody for sentencing computation purposes. *See, e.g., id.; United States v. Wilson*, 503 U.S. 329, 337 (1992) ("Congress made clear that a defendant could not receive a double credit for his detention time."). As such, pursuant to § 3585(b), the BOP will not assign prior custody credit if the defendant has already received credit toward another sentence—for example, in a separate state prosecution.

The upshot of all this is that the State, and not the Federal Government, has retained primary custody over Mr. Karasev, despite his being in the physical custody of the U.S. Marshal since November 7, 2023. As such, the State takes priority, and is entitled to have Mr. Karasev serve any sentence imposed against him in that case before any sentence imposed by the district court is served, regardless of the chronological order of sentence imposition. *See Thomas*, 923 F.2d at 1365.

More to the point, once Mr. Karasev is sentenced in the instant case, he will be transferred back to Santa Clara County, where he will address his state charges. In the event that case is not dismissed, and instead resolves for custody time, the BOP will not assign him any pretrial credit toward his sentence for time that is assigned toward the state sentence. Depending on the resolution of Mr. Karasev's state case, he may serve substantially more time than the requested sentence. If, for example, he is sentenced to "time served" in the state case after these proceedings, the BOP would treat those pretrial credits as going toward the state case, and not toward this case.

A sentence is likely to be imposed in Mr. Karasev's state case. The defense respectfully requests that the Court take the pending state matter into consideration, impose a sentence of 102 months, and order that it run concurrently to any term imposed on the state case. Specifically, the defense requests that the Judgment & Commitment Order indicate clearly that the sentence imposed on Counts One and Two <u>run concurrently with any sentence to be imposed in Santa Clara County Case No. C2302616.</u>

The Court has discretion to order the sentence on Counts One and Two run concurrently to the state term, but if the Court is silent on the issue, it will be treated as consecutive. *See United States v.*

1   *Setser,* 566 U.S. 231 (2012); *see also* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed

2   at different times run consecutively unless the court orders that the terms are to run concurrently."). In

3   determining whether the sentence should be concurrent, section 3584(b) directs the Court to consider

4   the section 3553(a) factors. *See* 18 U.S.C. § 3584(b).

5          Here, the section 3553(a) factors, and fundamental notions of fairness, indicate that imposing

6   the sentence concurrent to any sentence imposed on the state case is appropriate. First, notwithstanding

7   whether the Judgment & Commitment Order in this case reflects that the sentence is to be treated

8   concurrently, the reality is that the BOP and the State of California may well not treat it that way. As

9   the Supreme Court noted in *Setser*, no matter the decision made by the district court at a federal

10  sentencing regarding whether the federal sentence is concurrent or consecutive to an undischarged state

11  sentence, "[i]n our American system of dual sovereignty, each sovereign—whether the Federal

12  Government or a State—is responsible for the administration of its own criminal justice system."

13  *Setser*, 566 U.S. at 241 (cleaned up). As such, the State of California will decide whether and to what

14  extent to grant him credit, notwithstanding what the BOP does. *Id.*

15         The Guidelines provide some guidance too. The Guidelines state that if "a state term of

16  imprisonment is anticipated to result from another offense that is relevant conduct to the instant

17  offense of conviction […] the sentence for the instant offense *shall* be imposed to run concurrently to

18  the anticipated term of imprisonment." USSG § 5G1.3(c) (emphasis added).

19         In summary, pursuant to section 3553(a), the Court should adjust the sentence imposed here—

20  *i.e.,* by imposing a sentence at the lowest end of the agreed upon range—and order it run concurrently

21  to any state term, to ensure the execution of an appropriate and fair sentence.

22  **II.    THE COURT SHOULD RESOLVE THE PARTIES' OBJECTIONS TO THE PSR IN
        THE DEFENSE'S FAVOR.**

23         The final PSR sets forth the parties' remaining objections to the PSR.

24         The Government objects to grouping Counts One and Two under USSG § 3D1.2(b). *See*

25  Addendum to the PSR. The Court should adopt Probation's position and find that the two counts

26  group, resulting in the final advisory sentencing range set forth in the PSR.

27         The Government further requests the PSR include three additional police reports included in

28

the "Other Arrests" section for the PSR. *Id.* Again, the Court should adopt Probation's position and resolve this objection accordingly. One incident was documented in ¶ 37 of the PSR. The other two reports did not result in any kind of detention or citation, and "do not contain sufficient indicia to support an allegation that the defendant engaged in criminal activity" such that they warrant inclusion in the PSR. *Id.* Because they do not qualify as criminal history, they should not be included in the PSR.

The defense objects to the characterization of the home search set forth in ¶ 11, which states that there was a methamphetamine lab inside the home. Inside the home, officers recovered methamphetamine, which was possessed by Mr. Karasev for personal use. Mr. Karasev did not have a "methamphetamine lab" inside the home. This conclusion appears to be drawn entirely from law enforcements' observations of methamphetamine and separate glassware, leading them to speculate that Mr. Karasev was manufacturing methamphetamine. For example, one police report noted "Karasev was *possibly* using his residence as a methamphetamine [] laboratory." Another report describing the search of Mr. Karasev's home noted "[t]here was a door that led to a small bathroom *believed* to have been a meth lab." And yet another report noted that agents located what they believed was an "inactive methamphetamine lab in the *garage*"—*i.e.*, not the bathroom, as the previous report had indicated. None of the police reports provide any insight or investigative analysis explaining the officers' opinions that methamphetamine was actively being manufactured in the home. Mr. Karasev did not have a methamphetamine lab inside his home and there is insufficient evidence to support law enforcement's conjecture that there was one. Accordingly, this material should stricken from the final PSR.

## III.   OBJECTIONS TO CONDITIONS OF SUPERVISED RELEASE.

Mr. Karasev respectfully objects to special conditions 1 and 2 recommended by Probation. *See* Sentencing Recommendation at 3. Condition No. 1 states: "You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer." *Id.* Condition No. 2 states: "You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns." *Id.*

"District courts have significant discretion in crafting conditions of supervised release pursuant

1  to 18 U.S.C. § 3583(d)." *United States v. Quinzon*, 643 F.3d 1266, 1270 (9th Cir. 2011). "That

2  discretion, however, is not limitless." *Id.* Supervised release "fulfills rehabilitative ends, distinct from

3  those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Special conditions

4  must reasonably relate to the factors set forth in §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

5  involve no greater deprivation of liberty than reasonably necessary for the purposes set forth in

6  (a)(2)(B), (a)(2)(C), and (a)(2)(D); and be consistent with any pertinent policy statement issued by the

7  USSC under 28 U.S.C. § 994(a). 18 U.S.C. § 3583(d)(1)–(3). The Government bears the burden of

8  demonstrating that a discretionary supervised release condition is appropriate. *United States v. Weber*,

9  451 F.3d 552, 557–58 (9th Cir. 2006). The "primary goal of a term of supervised release is to ease the

10  defendant's transition into the community after the service of a long prison term for a particularly

11  serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison

12  for punishment or other purposes but still needs supervision and training programs after release[.]" *See*

13  USSG § 5D1.1, Introductory Commentary (cleaned up).

14       Moreover, the U.S. Sentencing Guidelines for supervised release have recently been

15  significantly amended. Chief among the structural changes to supervised release was the

16  Commission's amendments which encourage courts to take an individualized approach to the

17  imposition and management of supervised release.

18       In § 5D1.3, Conditions of Supervised Release, the guideline was restructured by adding a

19  general instruction that courts "should conduct an individualized assessment to determine what, if any,

20  discretionary conditions are warranted." USSG § 5D1.3(b)(1).  The overarching message conveyed

21  through the Amendments is that more conditions are not always better, and are not always warranted.

22       The Court should not impose the above conditions. Mr. Karasev stands convicted of willful

23  destruction of an energy facility. The above conditions are clearly designed for ensuring compliance

24  and rehabilitation amongst offenders convicted of financial crimes. They do not reasonably relate to

25  any of the relevant section 3553(a) factors, yet they do involve a greater deprivation of liberty than

26  reasonably necessary. These conditions will require an excessively intrusive and unnecessary level of

27  involvement on the part of Probation in Mr. Karasev's personal finances, while failing to serve any

28  rehabilitative needs, and without any justification for them.

DEF. SENT. MEM.
*KARASEV*, CR 23–364 BLF

1    Probation's purported justification for these conditions provide little support, because in

2    essence, its *only* justification is that Mr. Karasev will owe restitution. But that sole fact, absent any

3    other justification in the record, cannot satisfy the Government's burden to justify the imposition of

4    these conditions. Indeed, doing so would render the condition more of a generic *standard* condition

5    rather than a *discretionary* one, since it would be applied in any case that had restitution imposed—no

6    matter the background or circumstances of the defendant, nor the nature of the offense. The Court

7    should decline to impose these conditions.

8                                              **CONCLUSION**

9        For the foregoing reasons, Peter Karasev respectfully requests the Court impose the requested

10   sentence.

11

12   Dated:  December 9, 2025                      Respectfully submitted,

13                                                 JODI LINKER
                                                   Federal Public Defender
14                                                 Northern District of California

15                                                 */s/ Dejan M. Gantar*
                                                   DEJAN M. GANTAR
16                                                 Assistant Federal Public Defender

17

18

19

20

21

22

23

24

25

26

27

28

DEF. SENT. MEM.
*KARASEV*, CR 23–364 BLF