CRAIG H. MISSAKIAN (CABN 125202)
Acting United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ANNE C. HSIEH (CABN 288159)
Assistant United States Attorney

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-0910
    FAX: (408) 535-5081
    Anne.Hsieh@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:23-CR-00364-001 BLF |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| PETER KARASEV, | |
| Defendant. | |

## INTRODUCTION

On April 29, 2025, Peter Karasev pleaded guilty to two counts of Willful Destruction of an Energy Facility in violation of 18 U.S.C. § 1366. His convictions stem from his planning and execution of two separate bombing attacks on energy infrastructure sites in San Jose, California. On both occasions, Karasev transported, placed, and detonated homemade explosive devices at energy transformers located in public shopping center areas, damaging the transformers and nearby property and temporarily depriving thousands of San Jose households and businesses of electrical power. Among those affected by Karasev's attacks were fifteen households on PG&E's Medical Baseline program who required continued electrical service from the transformers that Karasev destroyed for life-sustaining medical needs. Given the extreme danger and utter disregard for public safety evidenced by Karasev's

conduct, the United States recommends a sentence of 126 months custody, followed by supervised release of 3 years, on each count, restitution, and the mandatory special assessment. The recommended sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, protect the public, provide adequate deterrence, and provide the Karasev with needed correctional treatment.

## BACKGROUND

### I. Nature and Circumstances of the Offense

Karasev's federal convictions stem from his knowing and willful engagement in two bombing attacks in San Jose that resulted in the destruction of two electrical transformers, damage to near properties, and the loss of power to thousands of homes and businesses. Collectively, the explosions knocked out power to over 1,500 PG&E customers and caused over $214,000 in repair costs to PG&E and other victims of the attacks. Investigation revealed not only that Karasev constructed, planted, and ignited the explosive devices that destroyed these transformers, but also indicated that the attacks may have been motivated in part by his personal frustrations and ties to the ongoing Russian-Ukrainian conflict. A search of Karasev's home and vehicle revealed enormous amounts of homemade explosive devices and other hazardous chemicals, materials, and tools, and demonstrated that, in the months leading up to the attacks, Karasev was both building and experimenting with improvised explosives and manufacturing methamphetamine in his own home.

#### A. Attacks in December and January 2022

On December 8, 2022, at approximately 1:30 a.m., Karasev detonated a homemade explosive device that destroyed an electrical transformer located near the Macy's department store at the Westfield Oakridge Mall. *Id.* at ¶ 6. As later revealed in a post-blast analysis, the transformer was destroyed by a fragmentation-producing device that had been placed between the transformer's cooling fins, which, upon detonation, tore two holes in the cooling fins, left fragmentation impact marks (which were consistent with BBs that were later recovered from Karasev's residence), and caused mineral oil coolant to leak out. The damage caused the transformer to overheat and shut down, alerting PG&E to the outage at approximately 2:30 a.m. The troubleshooter who responded to the emergency observed the leaking

oil and requested that the transformer be de-energized before it went "catastrophic." At the time of discovery, PG&E assumed that the outage was due to a transformer failure and replaced the transformer without informing law enforcement.[1] The outage affected 1,451 PG&E customers and, due to the extent of the repairs needed, power was not restored until approximately 5:38 p.m. later that day.

On January 5, 2023, at approximately 2:50 a.m., Karasev again detonated a homemade explosive device at another electrical transformer located near the Plaza Del Ray shopping center on Snell Avenue—a strip mall area surrounding by small stores and businesses, including a Nob Hill Foods, Round Table Pizza, and Muslim community center. This electrical transformer was also owned by PG&E and the bombing led to a 26-hour power outage affecting 55 PG&E customers, including many small businesses in the area. In this attack, the transformer was destroyed by a significantly more powerful explosive device that had been placed at its base, and the explosion caused severe damage to both the transformer and an adjacent building. The explosion was captured by nearby surveillance footage:



---

[1] A security guard in the area called 911 to report hearing an extremely loud explosion approximately 15 minutes prior to his call. The report was received by the fire department and deemed a transformer failure without further referral to the police.

UNITED STATES' SENTENCING MEMORANDUM   3
5:23-CR-00364-001 BLF

When the troubleshooter arrived, he noticed similarities to the earlier transformer failure at the Westfield Oakridge Mall and observed damage that led him to suspect the cause was an explosive device. Based on suspicions of foul play, PG&E reported the incident to law enforcement.

In response, San Jose Police Department (SJPD) arrived on scene and began its investigation. SJPD secured surveillance footage that captured the Snell Avenue bombing and revealed that a single suspect wearing dark clothing and a backpack had arrived on scene by bicycle at approximately 2:48 a.m. As captured in the footage, the suspect placed his backpack towards the bottom of the transformer box, used an ignition source to light it on fire, then fled the scene on his bicycle around 2:53 a.m. After over five minutes of the fire visibly burning, the transformer exploded in a large blast (at approximately 2:57 a.m.). Based on the blast expert's analysis of recovered evidence at the scene, the Snell Avenue explosion was caused deliberately by a flash powder-based destructive device inside a bag or backpack. The explosion blew a large hole in the transformer box and shattered the windows of an adjacent dental office.

Based on additional video footage obtained from various sources in the area, the same suspect was captured traveling on his bicycle in the area before and after the explosion, establishing his path and timeline of travel through several residential neighborhoods to and from the attack. With this information from the surveillance footage, SJPD sought warrants and conducted further investigation, which eventually led to Karasev's identification as the suspect who was riding his bicycle to and from the Snell Avenue attack and the likely bomber responsible for both attacks.

Karasev's Google search history revealed several incriminating searches leading up to and following the Oakridge bombing. On December 8, 2022, at approximately 1:57 a.m., within minutes of the 911 call reporting the explosion, Karasev began searching for "san jose news." At approximately 2:05 a.m., Karasev searched for "shaped charge" and accessed the Wikipedia page for this term.[2] At approximately 2:29 a.m., Karasev began searching "Find or report electric outages - PGE." At approximately 3:03 a.m., Karasev searched, "sjfd explosion." Later, on January 5, Karasev was again searching for things like "san jose explosion," "San jose explosion today," and "pge outage map."

---

[2] These same words were also found written on a wall/board at Karasev's house, and correspond to the type of device that law enforcement believes was used for the bombing.

Additionally, his search history revealed extensive searches related to constructing explosive devices, uses of hazardous chemicals and explosive materials, infrastructure bombings and attacks (both locally and related to Russia), and news about the Russian-Ukrainian war and political affairs.

### B.    Arrest and Search Warrants

On March 1, 2023, Karasev was arrested by SJPD detectives at his workplace and transported to SJPD for an interview (briefly described below).  At the time of his arrest, Karasev had a small green satchel on his person that contained a clear glass tube with a silver cap.  Inside the glass tube was a white crystalline substance, which detectives recognized and seized as suspected crystal methamphetamine.

Karasev's vehicle was also searched during his arrest.  In the glove box of his car, law enforcement located a homemade grenade and a pair of M-type devices taped together and fused together with a shared piece of powder train time fuse.  M-type devices are powerful destructive devices contained in cardboard cylinders and are usually filled with a black powder or similar energetic material to cause a detonation. In analyzing these items, a bomb technician reported that the effect of taping the devices together greatly increased their explosive effects and the risk of injury or death to any person in proximity of the explosion. On the center of the dashboard of the car, law enforcement also located two handheld, remote controllers with telescoping antennas with on/off buttons.  As noted in the bomb technician's report, bomb builders are known to utilize similar wireless transmitters to remotely detonate IEDs (improvised explosive devices).

At Karasev's office, officers seized several packages, which contained around a dozen unopened containers of hazardous chemicals and explosives, including: several 500g containers of Tetrasodium Salt, ACS, Benzoic Acid, Crystal (lab grade), and Chromium Trioxide (Anhydrous); two 1-lb packages of Hodgdon Pyrodex Propellant and Triple 7 Propellant (both black powder substitutes); 2-lbs Accurate 2230, Smokeless Propellant; 2-lbs Schuetzen Black Powder; 72 IMR White Hots performed muzzleloading rifle charges; 240 Alliant Powder Blue MZ performed muzzleloading rifle charges; 60 Hodgdon Triple 7 Firestar performed muzzleloading rifle charges; and 2 screw-on funnels for propellent powders.  The bomb squad determined that all the above materials were hazardous chemicals or explosives and disposed of them accordingly.

On March 2, 2023, SJPD and several special operations teams executed a search of Karasev's

UNITED STATES' SENTENCING MEMORANDUM   5
5:23-CR-00364-001 BLF

residence. The house was in a state of significant disarray, with homemade explosive devices, unidentified chemicals, and unsecured firearms located throughout the home, and exposed electrical wiring running along the outside of the house and on the roof.

The evidence recovered from the residence included: (1) multiple firearms and weapons, including a Wesson, Stevens and Miller Shotgun, an AK-47 Style Century Arms Rifle, a Ruger .223 Rifle, a 37mm Tac-79 Launcher, and a Taurus Forjas 45 Cal Pistol "1911"; (2) several homemade destructive devices in different stages of completion, including an incomplete steel pipe bomb, a homemade mortar (constructed out of a syringe and cardboard tube with rocket fins at the base) in the laundry room, flash powder (a highly explosive material) along the floor of the laundry room, and a homemade grenade (constructed out of a small plastic jar that was capped by a nut and bolt) in the refrigerator; (4) significant amounts of hazardous chemicals, powders, and substances, including over 300 pounds of explosive precursor materials; and (4) a methamphetamine lab in the garage, with drug manufacturing equipment and suspected drugs. Subsequent lab analysis confirmed that all but one of the destructive devices removed from Karasev's home were filled with a flash powder/smokeless powder combination.

Due to the extent and volatility of the substances and items located at the residence and significant safety concerns for officers and the surrounding neighborhood, the search of Karasev's home took significantly longer than anticipated (approximately four days) and required the assistance of several other agencies, including FBI, DEA, ATF, and the National Guard. Additionally, based on the risks from the search and cleanup of hazardous materials, the neighboring homes had to be evacuated during the search operation, resulting in neighbors and families incurring substantial costs due to their emergency displacement. *See* Exhibit C-2.

### C.     Interview Statements

In the course of its investigation, law enforcement conducted several interviews, including those of Karasev, his partner ("N.Z."), and an associate to whom Karasev had previously provided explosive devices ("D.L."). During his interview, Karasev spoke about testing and setting off rockets in his backyard and on the bicycle trail near his house, claimed he was using methamphetamine as a replacement for Adderall, and mentioned he had been having a difficult time with the current conflict between Russia and Ukraine because he had family in both countries, and compared it to parents getting

a divorce.

N.Z. told law enforcement that she had seen Karasev experimenting with glass objects and other things at home, and knew he was interested in rocketry and firearms, but did not know or understand what he was doing or condone his activities. N.Z. stated she was regularly trying to keep hazardous things in the home away from her children and that she thought Karasev's hobbies were risky because they lived in a densely populated area. N.Z. also noted that Karasev consumed a lot of media concerning Russia and Ukraine and was often upset when doing so. She specifically recalled that he discussed the Wagner Group several times as well as the one-year anniversary of the Russian-Ukrainian conflict. According to N.Z., in the several months before his arrest, Karasev began receiving numerous packages and would often go on late night bicycle rides. When asked if she recalled anything regarding Karasev's activities on the mornings of the bombings, N.Z. refreshed her memory by looking at her texts, which showed that, minutes before the Snell bombing, Karasev texted N.Z.: "Bike ride / getting rid of unsafe box." N.Z. also recalled that when Karasev returned from his bike ride that early morning, he made some reference to the conflict in Ukraine again and a statement to the effect of "why should everyone feel safe."

N.Z. mentioned that she thought there might have been a third possible bombing around September 2022 because she recalled Karasev bragging about the incident to their friend, D.L., about the incident, and believed that Karasev may have even given D.L. an explosive device. N.Z. stated that they knew D.L. because he supplied them with methamphetamine. Searches of both Karasev's and D.L.'s phones revealed that the two had several discussions in September and October 2022 about an explosive device that Karasev had given to D.L. and was advising D.L. to use. *See* Exhibit C-2. As a result, SJPD interviewed D.L., who confirmed that Karasev had indeed given him an explosive device and told him to use it, but claimed that he never did, but instead abandoned it in a garbage dumpster near a Whole Foods. *Id*.

## II.   Defendant's History and Characteristics

Karasev is a 38-year old, Russian-born naturalized U.S. citizen, who has PhD in electrical and computer engineering. At the time of his offense, he was employed as a software engineer at Zoox, making $250,000 a year, and was previously employed as a software engineer at the Toyota Research

Institute, also making $250,000 a year. Karasev was also living with his partner, N.Z. and their three young children (age 5 or younger at the time of his crime) in his San Jose home, worth over $1.5M at the time[3] and located within a 3-mile of radius of the sites of his bombing attacks.

While Karasev has no criminal convictions, his background includes other arrests and concerning incidents, including: an 11/19/2020 arrest for brandishing a firearm and two other child endangerment incidents reported to Mountain View Police Department. *See* Exhibit C-3. Additionally, while Karasev was working at the Toyota Research Institute between 2020 to mid-2022, he reportedly made concerning statements to a coworker about taking trips to Nevada to shoot Tannerite, making ghost guns with military officers, and "FPS Russia" videos and self-driving videos involving pedestrians being hit. *See* Exhibit C-1. Worried that Karasev wanted to hurt others and would misuse explosives, the coworker reported the concerns to TRI. *Id*.

### III. Victim Impact and Restitution

The direct victims of Karasev's criminal conduct include PG&E and local businesses that were forced to shut down temporarily, lose revenue, and bear the costs of repairing the physical damage from the explosions caused by Karasev, as well as over 1500 households and other PG&E customers in the San Jose area who lost access to power as a result of the attacks. *See* Exhibit A (PG&E Victim Impact Materials); Exhibit B (Other Victim Impact Materials).

PG&E submitted a brief in support of its victim impact statement and restitution claim, along with supporting declarations. *See* Exhibit A. As a result of the bombings, PG&E had to deploy at least 16 crew members to attend to the destroyed transformers and ensure safety at the incident site. At the time of the Snell Avenue attack in January 2023, most PG&E electrical service crews were on storm duty due to the extreme weather patterns at that time; as a result of the explosion, PG&E had to divert workers from responding to other outages and emergencies during the storms to attend to the destroyed transformer. Exhibit A-3 (Armstrong Decl.). The total cost that PG&E expended in labor and repair costs, including the costs of new transformers, was $200,293.67. *Id*. On top of the physical and

---

[3] Soon after his arrest, Karasev listed his home for sale for $1.55 million. *See, e.g.* https://www.washingtonpost.com/nation/2023/10/30/california-meth-lab-house-san-jose-million/. Karasev later sold the home in May 2024, and it is currently relisted for sale at $1.899M. *See* https://www.zillow.com/homedetails/668-Potomac-Ct-San-Jose-CA-95136/19708245_zpid/.

UNITED STATES' SENTENCING MEMORANDUM   8
5:23-CR-00364-001 BLF

financial harm caused to PG&E directly, Karasev's conduct also caused unique risk to at least fifteen households enrolled in PG&E's Medical Baseline Program, which is program for customers who depend on power for certain medical needs. Exhibit A-4 (Arreola Decl.). Individuals who qualify for the program include those with "life-threatening illnesses or compromised immune systems that require heating and/or cooling to sustain life or prevent medical deterioration," and those who use dialysis machines, oxygen generators, and other critical medical devices. *Id*. The program requires PG&E to provide advance notice of planed power outages to its Medical Baseline customers as well as other efforts and resources to help minimize the impact of a disruption to electric service. *Id*. PG&E intends to exercise its right under the Crime Victims' Rights Act to speak at the sentencing hearing regarding the harms caused by Karasev's conduct.

The bombings also caused property damage to other businesses in the area and disrupted their operations. *See* Exhibit B. For example, the explosion broke three windows of a local dental office, forcing the office to close for the day. The office reported a loss of $8,830.00 including their loss of revenue, staff costs, and janitorial cost to remove debris. The office's property manager bore the cost to repair the broken windows. *Id.* Similarly, a local Round Table Pizza had to shut down for the day, resulting in revenue losses for that day. Based on the restitution claims received thus far, the loss and restitution amount caused by Karasev's criminal conduct amounts to a total of $214,880.67, broken down as follows: (1) PG&E: $200,293.67 (costs to repair transformer/property damage, does not include investigation costs, costs of outside counsel, or lost profits); (2) Best Choice Dental: $8830 (production/revenue loss; loss of income to staff; property damage and cleanup costs); (3) CalStar Management (property owner of damaged building) - $4495 (cost of replacement for broken windows); (4) Round Table Pizza - $1262 (revenue loss). *See* PSR ¶ 15; Exhibits A & B.

## DISCUSSION

### I.   Legal Standard

"The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). These goals include the need for the sentence to reflect the seriousness of the

offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *Id.*; *see also* 18 U.S.C. § 3553(a).

The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines and then evaluate the sentence for substantive reasonableness in consideration of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. The factors to be considered under section 3553(a) include, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (4) the need for the sentence imposed to protect the public from further crimes of the defendant; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to the victims of the offense.

## II.     Sentencing Guidelines Calculation and Plea Agreement

The government agrees with the sentencing guideline calculation in the PSR. Based on a total offense level of 21 and Criminal History Category of I, the imprisonment guidelines range is 37 to 36 months. Under the plea agreement, which is binding on the Court if accepted, the parties have agreed to recommend a term of imprisonment between 102 and 126 months. Although this is technically an upward variance from the currently applicable guidelines range based on Karasev's pleas, the parties have agreed that this upward variance is appropriate for reasons including: (1) under the plea agreement, the government promises to dismiss Count 3, which would have resulted in a guidelines range of at least 157 to 166 months if applied as a count of conviction; and (2) consideration of the 18 U.S.C. § 3553(a) factors in this case, as further discussed below.

### A.     Grouping

Consistent with the plea agreement, the adjusted offense level for each count of conviction is 21, including the adjustment for acceptance of responsibility. While the parties did not reach any agreement with regard to grouping, the government previously explained its view on why the two counts of

conviction did not qualify for grouping under USSG § 3D1.2(b) given the charges and facts of this case, which is captured as the government's "Objection Number One" in the PSR.  *See* PSR Addendum ¶ 2.

Because the government recognizes that the grouping question is not clear-cut and may be decided by the Court on a case-by-case basis, the government hereby withdraws its "Objection Number One" as a formal Guidelines objection and accepts the Guidelines range as calculated in the PSR. However, the government asks the Court to consider the following underlying arguments in its consideration of the 18 U.S.C. § 3553(a) factors and for why the upward variance agreed-upon by the parties is appropriate in this case.

Specifically, the specific base offense guideline applied here for Counts 1 and 2 (USSG § 2K1.4) is neither listed in those "covered" nor those "specifically excluded from the operation of this subsection." USSG § 2K1.4 is also not driven by the amount of harm or loss caused and does not account for any overlapping specific offense characteristics that might result in "double counting" of offense behavior. Thus, under the rule, "a case-by-case determination must be made based upon the facts of the case and the applicable guidelines . . . used to determine the offense level." USSG § 3D1.2.

Probation argues that Counts 1 and 2 should be grouped under USSG § 3D1.2(b) because the counts "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." In this case however, the acts underlying Counts 1 and 2 account for two separate bombing attacks that involve only one overlapping victim (PG&E) amongst others, and neither the charges nor the evidence indicate a "common criminal objective" or "common scheme or plan." According to Karasev himself, his acts were driven by his general interest in testing and setting off rockets and bolstered by his drug use, and not because he had any common scheme or plan to hurt or target certain victims in this case. There is little to no evidence that Karasev had any common scheme or plan to target PG&E specifically; rather, the evidence shows that Karasev wanted to target infrastructure sites that would likely have wide community impact if damaged by explosions. The fact that PG&E happened to be the owner of the electrical transformers that Karasev attacked does not necessarily mandate that the counts be grouped. Indeed, if Karasev had elected to target two different types of infrastructure targets (say, an electrical transformer and a sewage utility line), or even two transformers owned by two different entities (say, PG&E and another power

UNITED STATES' SENTENCING MEMORANDUM   11
5:23-CR-00364-001 BLF

company, or a municipality), the offenses likely would not be grouped under the Guidelines. Given the evidence, the government did not charge any conspiracy or scheme here. Instead, Karasev stands convicted of two separate counts that are based on two different bombing attacks at separate sites, both of which posed significant harm to the community and caused separate injuries to disparate victims.

In sum, while the government agrees that the Court should adopt the Guidelines calculation in the PSR, it asks the court to consider the above-mentioned considerations pertaining to Karasev's criminal conduct and the different victims impacted by the separate attacks in assessing the appropriateness of the upward variance and the sentence to be imposed.

### III.   Sentencing Recommendation

The United States recommends that the Court sentence the defendant to 126 months of imprisonment with three years of supervised release to follow, restitution, and the mandatory special assessment. This recommended sentence would be sufficient but not greater than necessary to reflect the purposes of sentencing, based on a consideration of the advisory Guidelines and the Section 3553(a) factors.

With respect to the nature and circumstances of the offense, Karasev willfully used explosives to damage critical infrastructure in the San Jose community, causing severe power outages that affected over 1500 households and businesses. His bombing attacks of the electrical transformers directly led to serious property damage and financial losses to PG&E and local businesses. He used his house and backyard—which he shared with his partner and young children, and which was located in a suburban residential neighborhood—as essentially a home factory for making and testing explosives. He also used his garage as a methampethamine laboratory and his home, vehicle, and workplace were replete with hazardous materials, explosive devices, and dangerous weapons as part of his course of conduct. Karasev's motivations for these egregiously dangerous acts may not be entirely clear, but the evidence (including his Google searches and his statements to his partner) indicate that they were triggered in part by his frustrations over the Russian-Ukrainian war and his desire to see others in his own community suffer from the fear of explosive attacks, just as those in war-torn environments abroad might be. Even accepting as true Karasev's claims to law enforcement that these acts were predominantly fueled by his interest in rocketry and drug abuse, his criminal conduct demonstrates at minimum an utter and callous

disregard for the safety of others—including his family, his neighbors, his coworkers, and the community at large. Such danger and harm posed by Karasev's conduct requires a sufficiently significant sentence in terms of providing adequate deterrence and protecting the public.

     In terms of his personal characteristics and history, Karasev is clearly a highly educated and skilled individual, with the apparent capacity and desire to build dangerous explosive devices and manufacture methamphetamine. Despite his stable, high-paying job as a software engineer and his affluent Bay Area home and young family, Karasev chose to spend his extra time planning and engaging in what would ultimately become classic terroristic acts in his own community—setting off homemade explosive devices on electrical transformers located in commercial shopping centers near densely-populated areas. Karasev's history—which includes incidents of child endangerment and an arrest for brandishing a weapon—also further underscores his pattern of blatant disregard for the safety of others. His reported statements to a prior coworker at TRI reveal that his deep fascination with the potential human harm that can be caused by dangerous weapons and activities was not a new phenomenon for him at the time of his crimes, but had been developing for at least some years. His drug use and mental health diagnoses, while certainly mitigating factors to consider, ultimately do not excuse the gravity of the conduct and harm in this case: methamphetamine users and individuals with ADHD do not normally resort to crafting and deploying explosive devices to bomb their community. Karasev's callousness for human safety, coupled with his unique ability and willingness to build and employ dangerous explosive devices against vital infrastructure and the community, presents an especially severe risk to the public that ultimately necessitates the imposition of a meaningful custodial sentence of 126 months.

     In sum, a sentence of 126 months imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of Karasev's offenses, promote respect for the law, afford adequate deterrence, provide just punishment, and protect the public.

**CONCLUSION**

For the reasons stated above, the United States respectfully requests that the Court sentence the Karasev to 126 months of imprisonment, to be followed by 3 years of supervised release, on each count, to be served concurrently, restitution of $214,880.67, and the mandatory special assessment of $200.

DATED: December 10, 2025                    Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney


 /s Anne C. Hsieh
ANNE C. HSIEH
Assistant United States Attorney